## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

1

VICTOR MANUEL SOLIS, MARTA MILAGROS
2   ORTIZ GALLIO, AND THE CONJUGAL
PARTNERSHIP COMPOSED BY THEM,
3

4          Plaintiffs

                          CIVIL NO. 98-1879(CC)
5           v.

6   PHILLIPS PUERTO RICO CORE, INC.,

7          Defendant

8  ═══════════════════════════════

9

10           **REPORT AND RECOMMENDATION**

11     Before this magistrate judge are Phillips Puerto Rico Core Inc.'s ("Phillips") Motion

12  Requesting Partial Summary Judgment and Second Motion Requesting Partial Summary

13  Judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs'

14  opposition and defendant's sur-reply (D.E. #29, 30, 34, 36). These motions were referred

15  by the court (D.E. #40) to be considered after the settlement conference was held (D.E.

16  #42, 45). For the reasons stated below, I recommend that Phillips' motion for partial

17  summary judgment be GRANTED.

18

19                         I.

20              **INTRODUCTION**

21     The instant case was originally filed against Phillips by its former employee Víctor

22  Manuel Solís ("Solís") before the Puerto Rico Court of First Instance, Guayama Superior

23  Part, under the provisions of the Americans With Disabilities Act of 1990, 42 U.S.C. §

24  Pérez

25  Velázquez

26  Fries
    Alvarez
    1/20/99

12101 ("ADA"), its Puerto Rico counterpart, Act 44 of 1985, P.R. Laws Ann. t. 1, § 501 ("Act 44"), the Family and Medical Leave Act of 1993 ("FLMA"), 26 U.S.C. § 2601 ("FMLA"), and Puerto Rico Act No. 80 of May 30, 1976, as amended, P.R. Laws Ann. t. 29 § 185 ("Act 80"). The Complaint was removed to the U.S. District Court for the District of Puerto Rico, pursuant to 28 U.S.C. §1446(b).

On March 31, 1999, the ADA claim was dismissed with prejudice. Plaintiffs' Amended Complaint was filed on April 6, 1999 (D.E. #28) submitting four causes of action under above-stated federal and state-law provisions. Phillips' motions for partial summary judgment seek dismissal of the remaining claims.

## II.

## FINDINGS OF FACT[1]

The uncontested facts of this case show the following:

1.    Solís began working for Phillips' Guayama plant on September 5, 1967. He held various positions and on May 1, 1994, he was promoted to a supervisory position in the Processing Department, which he held until he ceased working for Phillips in October of 1996.

2.    Phillips' Guayama plant operates in three rotating shifts during a 24-hour period. Solís had worked all three shifts.

---

1.    Phillips filed in this case a Statement of Uncontested Facts and a Second Statement of Uncontested Facts. Solís filed a Statement of Uncontested Facts in support of his opposition to Phillips' request for Summary Judgment. However, since Solís has not filed a Statement of Facts it contends are in dispute, as required by Rule 311.12 of the Local Rules of the U.S. District Court for the District of Puerto Rico ("Local Rules"), Phillips' Statement of Uncontested Facts must be deemed admitted. Furthermore, Phillips' Statements of Facts is supported by Solís' deposition testimony. *See*, Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).

3.    Solís admitted in his deposition that attendance is important in this type of operation and that it is part of every employee's performance.

4.    Nelson Ramírez ("Ramírez") was in charge of authorizing vacations, scheduling, appointing temporary employees, authorizing time off for employees in the Processing Department, among other duties.   Ramírez was not in charge of the operational aspect of the Processing Department and he was not Solís' supervisor.

**Solís' performance and absenteeism.**

5.    Before October 1996, Solís was involved in the following incidents: (a) He told Ramírez to "leave him alone" and complained that Ramírez was scheduling him for too many training sessions; (b) Ramírez counseled Solís for not following proper channels after he complained directly to the Phillips' President regarding the training schedule; (c) Solís had an encounter with Ramírez' acting secretary when he was asked to supply certain information requested by Ramírez which he said he had already furnished; (d) Solís was counseled by Mark Ingebretson ("Ingebretson") (Processing Department Manager) and held liable for the overflow of a tank under his custody that occurred when he transferred to another supervisor his responsibility for the tank; (e) Solís was reprimanded for removing two (2) independent contractor employees from a control room area; (f) Solís did not follow Ramírez' instructions that Solís document problems that were occurring with certain employees under his supervision; (g) in 1996, Solís argued with Ramírez over his decision not to replace an employee who was perceived to be a "poor performer."

6.    In addition, Solís had been reprimanded, before and after the beginning of his medical condition, for his pattern of absences and for requesting time off without

following company policy (Solís sought to charge absences to compensatory time instead of sick leave).  Solís asked Ingebretson to instruct Ramírez to allow this procedure.

7.    After the passing of Hurricane Hortense, Solís took three (3) unauthorized days off (for having worked an extended shift when his relief could not make it to work due to the storm), and he also took unauthorized time off after working overtime for three (3) consecutive nights (because his relief did not make it to work).

8.    Prior to October 1996, Ingebretson had asked Solís to improve his attendance.

**Solís' medical condition.**

9.    In 1994, Dr. Melba Sotomayor, a neurologist, diagnosed Solís with a thyroid condition, and referred him to Dr. Alejandro, a thyroid specialist, and then to Dr. Julio Morales, who prescribed him rest.

10.    Solís returned to work after he had rested.

11.    Solís was absent with pay while receiving treatment and undergoing an operation by Dr. Morales.

12.    Dr. Edna Griselle Meléndez, whom Solís began visiting around 1994, is currently treating his thyroid condition.

13.    None of these doctors issued work restrictions to Solís besides rest.[2]

14.    Phillips consistently granted Solís company-paid time off to attend medical appointments with his doctors.

---

2.    While Solis still worked at Phillips, Dr. Latalladi, a cardiologist, restricted him from working continuously or in an excited manner for more than ten minutes.  Solis did not give Phillips the written restriction issued by his doctor, and did not inform Phillips of any work restrictions other than rest.  Solis does not allege discrimination due to any heart condition.

15.    Solís claims that on four (4) occasions over a three-year period Phillips did not allow him to be absent.

16.    Solís has testified that at least during one of these incidents, he was not allowed time off because there was no one available to cover for him.

17.    During the last of these instances on October 21, 1996, Phillips requested Solís visit a psychologist, afforded him ten (10) paid days off, and advised that if he was not doing better he would be allowed additional days off.  Solís never returned to work at Phillips.

18.    On October 23, 1996, Solís began receiving psychological therapy from by Dr. Ivonne Borrero, who was the first to diagnose his depression.  He later was additionally treated by Dr. Luis A. Torrado.

19.    Both have restricted him from returning to work and are currently treating his depression, which was diagnosed after he stopped reporting to work at Phillips.

20.    Since October 21, 1996, his treating physicians have never authorized him to return to work.

21.    Because Solís' depression continued, Phillips recommended that he apply for Short Term Disability ("STD") benefits and advised him that he would be reinstated if he was able to return to work within 26 weeks.

22.    During this time Solís returned on several occasions to meet with Lucy Merced, Phillips' benefits clerk, and to deal with matters related to the approval of his Long Term Disability ("LTD") application.

23.    Solís completed and signed the documents to request STD and LTD.  Both benefits were approved.

24.    Solís was advised that LTD rules required him to apply for Social Security benefits in order to receive benefits in the amount of 50% of his salary.

25.    On July 29, 1997, General American, Phillips' LTD insurance carrier, advised Solís that effective July 11, 1997, he would be granted certain monthly LTD benefits until he received a final decision on his application for Social Security benefits.

26.    Solís complained that his LTD benefits should be greater since he was not yet receiving Social Security benefits.

27.    After Lorenzo Gil and Arthur Austin (Phillips' Human Resources Directors) contacted General American, Solís was awarded an increased benefit.    Solís began receiving Social Security disability benefits effective August 26, 1997.

28.    On April 20, 1998, General American advised that Solís had been overpaid LTD benefits.

29.    Solís admitted that it was General American that made the decisions regarding his LTD benefits, that all LTD related correspondence was sent by General American, and, that he has no dispute with Phillips in connection to his STD or LTD benefits.

30.    Solís presently is covered by Phillips' medical insurance plan available to retired employees.

**Phillips' Policy.**

31.    Phillips' policy prohibits the company doctor or nurse from disclosing an employees' medical information to any person at the company.

32.    An ill employee must tender the medical certificate to dispensary personnel, who either authorizes the employee to work or informs the supervisor of the physician's work restrictions, without disclosing any additional information.

33.    Solís admitted, and we find that, due to this policy, Ramírez did not know of his condition or what his medical appointments were for, since the infirmary nurses did not give Ramírez that information.

34.    Pursuant to Phillips' Corporate Policy, all medical leaves, including FMLA run concurrently.

## II.

## SUMMARY JUDGMENT STANDARD

State law causes of action filed in federal courts are subject to the application of federal procedural rules.  Consequently, Rule 56 of the Federal Rules of Civil Procedure and its interpretative case law govern the ruling on Phillips' requests for summary judgment, regarding all of Solís' claims.

A federal court may grant summary judgment in a civil action "if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See Celotex; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505  (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348  (1986).  Once a party seeking summary judgment has made this showing, the burden shifts to the nonmovant who must point to specific facts demonstrating that there is a trial worthy issue.  See Celotex, 477 U.S. at 324.

To satisfy the criterion of trial worthiness, an issue must be "genuine." That is, the relevant evidence, viewed in the light most favorable to the party opposing the motion must be sufficient to allow the fact finder to solve issue in favor of either party. *See* Anderson v. Liberty Lobby, Inc.; Blanchard v. Peerless Ins. Co., 958 F.2d 483, (1st Cir. 1992); Continental Casualty Co. v. Canadian Universal Ins. Co.; 924 F.2d 370, 373 (1st Cir. 1991); Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976) (In summary judgment motions, the Court will not resolve questions of credibility or conflicting inferences but, will assess the sufficiency of evidence as a matter of law, resolving all factual disputes in favor of the opponent.)

Trial worthiness needs "more than simply show[ing] that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 586. The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve ...." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cor. 1989). If the evidence is based on conjecture, or is not significantly probative of the fact alleged in the complaint, there is no genuine issue, and the Court may grant summary judgment. Anderson v. Liberty Lobby, Inc.; First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968); Local No. 48, United Broth. of Carpenters & Joiners v. United Broth. of Carpenters & Joiners, 920 F.2d 1047, 1050 (1st Cir. 1990).

Trial worthiness further requires that the dispute involves a "material" fact. *See* Anderson v. Liberty Lobby, Inc. This means that a fact has the capacity to affect the outcome of the litigation under the applicable law. *See id.*; *see also* United States v. One

1   Parcel of Real Property, Etc. (Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200,

2   204 (1st Cir. 1992). "If the facts on which the nonmovant relies are not material, or if its

3   evidence "is not significantly probative," *brevis* disposition becomes appropriate." Nat'l

4   Amusements, Inc. v. Town of Dedham, 43 F.3d 731 (1st Cir. 1995).

5                                             III.

6                            **SOLÍS' DISCRIMINATION CLAIM**

7

8         The parties disagree whether the appropriate standard to assess disability

9   discrimination under Act 44 is that of the ADA or of Puerto Rico Act 100 of June 30, 1959,

10  P.R. Laws Ann. t. 29 § 146 et seq. ("Act 100").   Act 44 was amended in 1991 to

11  harmonize it with the ADA. P.R. Laws Ann. t. 1, § 507(a).[3]  The legal analysis followed

12  under the ADA has been applied by Puerto Rico courts to claims under Act 44.  Rivera

13  Flores v. Compañía ABC H/N/C McGraw of P.R. Inc., 138 D.P.R. ____ (1995), 95 C.D.T.

14

15  25.  See Ríos v. Cidra Manufacturing Operations of P.R., 98 TSPR 74, 98 WL 422495

16  (P.R. 1998).  Consequently, Solís' Act 44 claim should be evaluated according to ADA

17  standards.   Furthermore, Act 44 was molded after the ADA, and since it is lacking

18  regulatory guidelines or interpreting case law, it is reasonable to conclude that ADA

19  standards should guide the determination of whether a plaintiff is entitled to relief under

20  Act 44.

21  **A.      Analysis under ADA standards**.

22        Since Solís has shown no direct evidence of discrimination, his claim is subject to

23  the burden shifting scheme established for Title VII cases in McDonnell Douglas Corp. v.

24

25  _____

26        3.   Statement of Motives of Act No. 105 of December 20, 1991.

Green, 411 U.S. 792, 801, 93 S.Ct. 1817, 1824 (1973); 42 U.S.C.A. § 12112.  *See also*

Jacques v. Clean-Up Group, Inc., 96 F.3d 506 (1st Cir. 1996).

Accordingly, Solís bears the burden of establishing: (a) that he is disabled within

the meaning of the ADA; (b) that he is qualified to perform the essential duties of the job,

with or without reasonable accommodation, and is able to perform the essential functions

of his job; and, (c) that Phillips discharged him or failed to accommodate him due to his

disability. Jacques 963 F.3d at 511;  McNemar v. Disney Store, Inc., 91 F.3d 610 (3rd Cir.

1996).

If Solís is able to meet this burden, Phillips must then set forth a legitimate,

nondiscriminatory reason for the adverse action taken.

**1.    Whether Solís' illness raises to the level of a disability**.

Not all physical impairments rise to the level of an ADA covered disability.  Katz v.

City Metal Co., Inc., 87 F.3d 26 (1st Cir. 1996).  To make an ADA claim Solís must prove

that he is a disabled individual.  From the uncontested facts it appears during Solís'

employment at Phillips, his thyroid condition (a physical impairment) did not rise to the

level of disability, substantially limiting his major life activity of working.  29 C.F.R. 1630.2

(i),(j)(2).[4]  During that time period he was undergoing nothing more than routine medical

examinations and his condition did not prevent him from performing his duties.  However,

seeing the facts in the light most favorable to Solís, we will assume for purposes of this

report and recommendation that he was disabled.

---

4.    At the time Solís was working at Phillips, he had not yet been
diagnosed with his emotional condition.

AO 72
(Rev 8/82)

### 2. Whether Solís is a qualified individual.

Disability discrimination is only prohibited when the affected employee is able to perform the essential duties of his job including the skill, experience, education, attendance, and other job-related requirements of the position he holds or desires, with or without reasonable accommodation. 29 C.F.R. § 1630.2. *See also*, Southeastern Community College v. Davis, 442 U.S. 397, 99 S. Ct. 2361 (1979).

The employee must prove that: (a) he can perform the essential functions of the job (functions bearing more than marginal relationship to the job); or (b) that a reasonable accommodation will enable him to perform those essential functions. Milton v. Scrivner, Inc., 53 F.3d 1118, 1123 (10th Cir. 1995); Jacques 96 F.3d at 511. Otherwise, an employee is not protected by the ADA (and Act 44). 42 U.S.C. § 12118; Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768, 771 (8th Cir. 1987), *cert. denied*, 485 U.S. 938, 108 S. Ct. 1116 (1988).

Solis was not "otherwise qualified" to perform the essential functions of his job since: (a) his physicians have issued restrictions prohibiting him from working; (b) he has not been authorized by his physicians to return to work, with or without any accommodations, reasonable or otherwise; (c) he was declared disabled and is receiving benefits from the Social Security Administration, which prohibits him from working while

receiving such benefits;[5] and (d) his absences impeded him from satisfactorily performing the essential duties of his job.[6]

Therefore, it is clear that Solís is not qualified to perform the essential functions of his job.    Consequently, Solís' disability claim should be dismissed.    42 U.S.C.A. sec.12112.  Soileau v. Guilford of Maine, Inc., 105 F.3d 12 (1st Cir. 1997).

### 3.    Whether Solís was reasonably accommodated.

The uncontested facts show that Solís never requested Phillips provide him any reasonable accommodations, and that his doctors never issued work restrictions, besides rest, prior to October 21, 1996.  Therefore, the only "accommodation" Phillips could offer was to allow Solís to rest when he requested it.    The record shows that Phillips consistently reasonably allowed Solís to rest with pay when required by his doctors.

Phillips also allowed Solís to attend most of his medical treatment appointments and granted him, sick leave, compensatory time, vacation leave, STD and LTD benefits, among others.

### B.    Analysis under Act 100 Standard.

Even if Solís' claim was evaluated under Act 100 standards, he is still not entitled to a remedy.  Act 100 creates a presumption of discrimination when a person is unjustly discharged, as defined by Act 80.  The employer must then show by a preponderance of the evidence that the dismissal was not discriminatorily motivated.

---

5.    Although his receiving Social Security Benefits does not automatically disqualify him from making a discrimination claim, this fact along with others such as the restrictions not to work issued by his physicians, and the progressive nature of his condition, render him unqualified to work, with or without accommodations, and precludes him from relief under ADA standards.

6.    Even if the reasonable accommodation required by Solís was to allow him to be constantly absent, his claim fails because, as admitted during his deposition, attendance is an essential element of his work at Phillips.

Under this scheme the Court must first evaluate if Solís' discharge was unjustified under Act 80. Since Solís was not actually discharged, he has to show that a constructive discharge took place. *See* <u>Vélez de Reilova v. Palmer Bros., Inc.</u>, 94 D.P.R. 175 (1967). If Solís was not constructively discharged, then the Court's inquiry should end, since the presumption that arises under Act 100 is that no discrimination took place. *See* <u>Ibáñez v. Molinos de P.R.</u>, 114 D.P.R. 42 (1983). If Solís was unjustly discharged, Phillips may rebut the presumption of discrimination by showing by a preponderance of the evidence that the dismissal was not discriminatorily motivated. <u>Id.</u>

**1.    <u>Solís' constructive discharge allegation.</u>**

A constructive discharge under Act 80 takes place when an employer induces an employee to resign. <u>Vélez de Reilova v. Palmer Bros., Inc.</u> Act 80 cites as examples thereof when an employer imposes more onerous working conditions on the employee, reduces his salary, lowers his job category or submits him to derogatory criticisms. P.R. Laws Ann. t. 29, § 185e.

Besides the above, federal courts evaluating constructive discharges, have considered factors such as changes in cubicle location, work title and duties, requirement to work during vacations and harsh confrontations with a supervisor. <u>Ramos v. Davis & Geck, Inc.</u>, 167 F.3d 727 (1st Cir. 1999).

Constructive discharge has required evidence that the new working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign and warns that employees may not be unreasonably sensitive to their working environment. <u>Greenberg v. Union Camp Co.</u>, 48 F.3d 22, 27 (1st Cir. 1995). *See also* <u>Darnell v. Target Stores</u>, 16 F.3d 174 (7th Cir. 1994), which requires a showing that the

1    employer's actions were part of a "plan" to force him to resign.  Otherwise, a claim of

2    constructive discharge must be dismissed as a matter of law.  <u>Stetson v. Nynex Service</u>

3    <u>Co.</u>, 995 F.2d 355, 360-361 (2$^d$ Cir. 1993) (A constructive discharge does not occur when

4    an employee was dissatisfied with the nature of his assignments, when the employee

5    feels that the quality of his work has been unfairly criticized, nor when the employee's

6    working conditions were difficult or unpleasant.)

7          The uncontested facts in this case show that Solís was not constructively

8    discharged under any of the aforestated factors.  His position, duties or job category were

9    not altered, his salary was not reduced, no adverse employment action was taken against

10    him, and his working conditions were not made intolerable.  He was never induced to

11    resign by Phillips.

12          Solís has claimed that he was denied four days off during a three-year period to

13    attend medical appointments of less that a full day duration (as opposed to dozens of

14    instances where permission was granted), that on four occasions he had to work 16-hour

15    or 18-hour shifts (which can be expected in a 24-hour operation) and that Ramírez, who

16    was not his supervisor, once said he should have been fired.  These isolated incidents

17    within a three-year span do not create an intolerable work atmosphere.

18          This Court cannot conclude that a reasonable person in Solís' position would feel

19    that his working conditions were intolerable and that he had no choice but to resign.

**2.    <u>Discharges by Operation of law</u>.**

          The Puerto Rico Supreme Court has construed Act 80 to allow for termination of

employment in similar situations where the discharge is by operation of law.  Courts have

found that just cause for dismissal under Act 80 exists when an employee is "discharged"

from his employment because he has not been released from medical treatment at the time the employer's duty to reserve employment has expired. <u>Segarra v. Royal Bank de Puerto Rico</u>, 98 TSPR 36 (1998), 99 WL 294502 (1999); <u>Torres González v. Starkist Caribe, Inc.</u>, 136 D.P.R. __ (1994).

Classifying Solís as an inactive employee is a consequence of his condition and of the provisions of the LTD plan (which Solís was informed of) and the Social Security Administration requirements. Thus, Solís' status was not a product of Phillips' whim, as prohibited by Act 80. Since Solís was not constructively discharged, it is presumed that his dismissal was not discriminatory.

**3.    Even if Solís was constructively discharged from his employment, Phillips has rebutted the presumption of discrimination.**

Even if Solís had established a <u>prima facie</u> case, any inference of discrimination that could have arisen there from vanishes upon Phillips' explanation of the actions taken. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 , 113 S.Ct. 2742  (1993); <u>Pages-Cahue v. Iberia</u>, 82 F.3d 533, 536 (1st Cir. 1996).

It is clear that the termination of Solís' employment does not amount to any adverse action by Phillips, since his status as an inactive employee was the consequence of the operation of various statutes, policies, and the restrictions of Solís' physicians. Because of Solís' medical condition and his own doctors' restrictions, he cannot meet a basic requirement of his job, attending work.

The only evidence Solís claims shows discriminatory motive by Phillips is: (1) that on four occasions between 1994 and 1996 he was denied days off to attend medical appointments; (2) that in 1995 he worked 16-hour shifts when the supervisor that was going to relieve him did not show up; (3) that in September of 1996, after the passage of

1  Hurricane Hortense, he worked during eighteen consecutive hours because the supervisor

2  that would relieve him got caught in the storm; and (4) that Ramírez supposedly once said

3  that he should have been fired.

4      Of these incidents the only ones related to Solís' medical condition are the four

5  denials to attend medical appointments.[7]  Solís recognized that at least one of these times

6  his request was denied because no one could cover him.  This is not enough to show that

7  Phillips had discriminatory intent towards Solís because of his condition, specially when

8  the undisputed facts show that Solís was consistently granted dozens of requests to

9

10  attend medical appointments.

11      No discriminatory intent can be drawn from Solís working extended shifts since it

12  was because of circumstances beyond Phillips' control (the passage of a hurricane, the

13  absence of the supervisor that was scheduled to relieve Solís from his work.)  These

14  events do not establish discriminatory intent on the part of Phillips.

15      Conversely, the uncontested facts show that Phillips attended to Solís' medical

16  condition.  Upon realizing Solís' needed medical assistance, Phillips sent him to see a

17  doctor, and later recommended that Solís enroll in STD.  Rather than showing

18  discriminatory intent, this only proves that Phillips was following its procedures and

19

20  complying the recommendations of Solís' physicians that he should rest and not report to

21  work.

22      Finally, since no one besides the authorized medical personnel at Phillips' infirmary

23  knew of Solís' condition prior to October 21, 1996, he cannot show that any action by

24

25      7.   Solis stated in paragraphs 18 and 19 of Solís' Statements of
Uncontested Facts that his appointment was "to see how the burning was
doing", that "what should have been a routine checkup . . . turned out to be

26  an absence from work of over a month."

1   Ramírez, or any other employee, was prompted by a discriminatory motive against him

2   because of his medical condition.

3       Even if Phillips had taken adverse action against Solís, the uncontested facts show

4   that Phillips had legitimate, nondiscriminatory reasons for such adverse action. *See*

5   Pages-Cahue, 82 F.2d at 536 (the Courts will not "second-guess" the business decisions

6   of an employer").

7

8       The uncontested facts show numerous reasons unrelated to Solís' disability that

9   justify an adverse action against him.  Solís does not contest his history of  non-health

10  related problems at Phillips, and his pattern of absences which is detailed as the

11  beginning of this report. This history enumerates many irregularities Solís engaged in

12  during his employment at Phillips that could have warranted disciplinary action against

13  him, including dismissal.

14                                    **IV**

15                      **SOLÍS' CLAIM UNDER THE FMLA.**

16

17      The FMLA allows eligible employees of covered employers up to 12 weeks of

18  unpaid leave in any 12-month period because of a serious health condition that makes the

19  employee unable to perform the functions of his/her position, among others. 29 U.S.C.

20  § 2612(a)(1)(1995); 29 C.F.R. § 825.100(a).

21      Solís claims that he was not given FMLA benefits on two occasions: when he was

22  absent 13-days because of his thyroid condition and to attend the four medical

23  appointments he was denied sick leave to attend (once in 1994, twice in 1995, and once

24  in 1996, on his last day of active employment at Phillips).

25

26

1   **A.    Solís did not suffer from a serious health condition and could perform the**
2       **duties of his job at the time he was employed at Phillips.**

3       "Serious health condition" is an illness, injury, impairment, or physical or mental
4   condition that involves:  (a) inpatient care in a hospital, hospice, or residential medical
5   care facility; or (b) continuing treatment by a health care provider.  29  U.S.C. § 2611(11).
6   Employees whose condition does not cause them to be absent from their position for
7   more than three calendar days do not suffer from a serious health condition.  Bauer v.
8   Varity Daton-Walther Corp. 118 F. 3d 1109 (6th Cir 1997); Seidle v. Provident Mut. Life
9   Ins. Co. 871 F. Supp. 238 (E.D. Pa. 1994).  An employee must provide the employer at
10  least sufficient information to put the employer on notice that an FMLA qualifying leave is
11  needed.  Stoops v. One Call Communications, Inc., 141 F.3d 309 (7th Cir. 1998).
12
13      If an employee qualifies for FMLA leave to care for the employee's own serious
14  health condition, the employer may require the employee to use the FMLA leave
15  concurrently with his or her accrued paid leaves. (i.e. vacation leave, personal leave, or
16  medical or sick leave) 29 U.S.C. § 2612(d)(2)(B).  If the employee's accrued paid benefits
17  exceed 12 weeks, he or she will not be able to enjoy FMLA benefits consecutively.
18  29 C.F.R. § 825.207(a).
19
20      Solís was not entitled to FMLA benefits in 1994 when he was absent for thirteen
21  days because of his thyroid condition, since at that time he was granted paid leave which
22  is the greater benefit.  Thereafter, he continued on medical visits on a monthly basis, but
23  those monthly visits were for medical check ups that did not exceed a period of three
24  days, thus not qualifying for FMLA benefits.  Solís was thereafter absent for a month, but
25  again, he was granted paid leave, which is a greater benefit.
26

AO 72
(Rev 8/82)

None of the requests made was for a period in excess of three days. Employer leave policies (sick leave) were meant to cover absences of less than three days as is noted in the legislative history of the FMLA. Stoops; Bauer; Brannon v. Oshkosh B'Gosh, Inc., 897 F. Supp. 1028 (M.D. Tenn. 1995). Solís was only attending follow-up appointments, which are not the type of leave contemplated by the FMLA. After these appointments, Solís would return to work as usual. Solís never presented a medical certificate requiring him to be off work on the four occasions at issue, and never gave Phillips any information suggesting that he could not work which would have caused Phillips to request that he provide a medical certificate.

Solís was allowed paid time off when he was initially operated on. Once recovered, Solís was fully released to return to work, which he did, and was not incapacitated further nor unable to perform his job at any time pertinent to his requests for time off to see his physician. In fact, Solís worked for nearly two years, from 1994 to 1996 with his thyroid condition, which demonstrated to Phillips that even if he had some type of illness, it was not a "serious illness" sufficient to deter him from performing his job functions.

Consequently, Solís did not qualify for FMLA benefits as to any of the events he cites either because his absences were not for an excess of three days or because he was granted a greater benefit: paid medical leave. Since leaves at Phillips run concurrently, Solís cannot claim them at the same time. By accepting paid leave, he cannot receive unpaid leave under the FMLA.

Solís was not "incapacitated" on those occasions when he alleges that was denied an opportunity to visit his physician. Hodgens v. General Dynamics Corp., 963 F. Supp. 102, 106 (D.R.I. 1997). It was not until October 1996, that Solís' physician restricted him

1  from working.  Solís is simply not entitled to FMLA benefits because he was never unable

2  to perform his job functions at the time he was allegedly denied time off to attend certain

3  medical appointments.

4      **1.    Solís was given notice of his rights**.

5      Although the FMLA requires employers to give notice of the rights afforded by it,

6  such duty arises at the moment when it can be anticipated by the employer that the

7  employee is in need of taking advantage of the leave.  Since Solís' need for the leave

8  could not have been anticipated, (his need was not evident as, for example, a pregnancy

9  or physical accident would have been) and was never requested, then the duty to give

10  notice did not arise.

11  

12      Solís claims that he did not know of the existence of FMLA benefits while he

13  worked at Phillips.  However, the uncontested facts and the evidence on record show that

14  Phillips placed a posting of FMLA benefits on its bulletin board and gave Solís written

15  copy of Phillips' FMLA policy.[8]  Phillips has in place an Unavoidable Absence Benefit Plan

16  which awards employees several leaves, including FMLA benefits.  All employees are

17  made aware of these benefits by providing them copy of the plan and by posting a copy of

18  Phillips' policy on bulletin boards on Company premises.  Employees have easy access to

19  the areas where these postings are located.  Phillips has, therefore, made its employees

20  aware of their right to FMLA benefits.

---

8.    This Court finds that Arthur Austin, as the person in charge of Phillips' Human Resources Department and custodian of the department's files, has access to employee records and other records contained in the Human Resources Department.  Austin can attest to information he gathers from company files.  From these files, Austin knows from which date the benefits were granted to Solís, when and where the FMLA postings were made and whether Solís was given notice of his benefits.

Furthermore, Solís never gave notice of his need for FMLA leave.  In fact, many employees were afforded FMLA benefits while Solís was still an active employee at Phillips.

As previously discussed, the FMLA requires that an employee give the employer sufficient information to put it on notice that the employee suffers from a condition that may qualify him or her to receive FMLA benefits.  Only when this is done, does the employer's duty to provide benefits arise.

Solís never gave Phillips any information that he needed FMLA benefits.  Solís' deposition testimony was clear that until his last day at work no one at Phillips knew of his condition, but the Company nurses, who by Company policy were precluded from divulging that information.  Solís specifically admitted that Ramírez, who made the decision denying the four requests for time off, did not know of his health condition.  It was not until Solís' last day of work at Phillips that Ramírez became aware that he had a serious medical condition. Since Solís never gave notice of his condition, he cannot claim that Phillips failed to advise him as to these benefits.

Ramírez could not have advised Solís since he did not know all the details about his condition.  Both Solís and Phillips' Statement of Facts point to the fact that when Solís broke down during his last day of work at Phillips, Ramírez spontaneously stated that he did not know that Solís was sick.

Because of the above, it is clear that Phillips was not put on notice that he suffered from a condition that qualified for FMLA benefits.

As such, the motion for Partial Summary Judgment filed by Phillips should BE GRANTED.

**IT IS SO RECOMMENDED.**

The parties have ten (10) days to file any objections to this report and recommendation.  Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986).

San Juan, Puerto Rico, January 13, 2000.

J. ANTONIO CASTELLANOS
UNITED STATES MAGISTRATE JUDGE